Case number 25-5169, Mark Bergens v. Diverse Concepts LLC et al., argument not to exceed 15 minutes per side. Mr. Hanson, you may proceed for the appellant. Good morning, Your Honors, and may it please the Court, Adam Hanson on behalf of Appellant Mark Bergens. The District Court erred in concluding that no reasonable juror could find that Bergens' disability was a but-for cause of his termination. The evidence in this case is stark. Bergens was a superstar performer, but after he suffered a stroke at work, everything changed. He was sidelined from his planned promotion. He was called ableist names. He was constantly questioned about his abilities. When a workplace prank provided a convenient pretext, his supervisors seized on it, firing Bergens on the spot without any semblance of investigation. Let me start with the affirmative evidence of discrimination before turning to pretext. This case is unusual because of the sheer volume of affirmative evidence of discrimination that's frankly rare in employment discrimination cases. Here, as I mentioned in my introduction, after the stroke, Bergens' supervisors constantly questioned his abilities, and this went well beyond the normal, how are you doing, how is your medical treatment coming along? It became very clear to Bergens that the reason that this questioning was so constant and so incessant was because his immediate supervisors had grave concerns about whether he would be able to fulfill his duties as a general manager with the planned promotion. And at least one of the comments said as much. Most of the comments were just, I don't know if you can do it, you look tired, and so forth. But at least in one instance, Bergens' supervisor said, I don't know that you're going to be up to training the staff at this new restaurant, the Blue Moose Alcoa. Bergens was also constantly called ableist names, the most common being the one-armed bandit. And I'd also like to set off, I mean, there are lots of cases from this court and others that talk about name calling, but most of those cases deal with name calling that's scattered over a long period of time, made by non-decision makers. Here, it was the opposite. Right after his stroke, the name calling was constant. But you're not contending that the people who fired him used the term one-armed bandit? They did not. We're not contending that, but I would point out what's unusual about this case is Bergens' direct supervisor, Ms. Purham, she did participate in calling him the one-armed bandit. So she's testified that at the time he thought it was funny and didn't make any reports. Bergens testified, his testimony on this point was nuanced. He said that he understood that his employees, his co-workers, and of course his boss were trying to be funny. And, you know, he's not a humorless person, right? But he also testified that he had a problem with it. And the problem wasn't his wounded pride or anything like that. His problem was that it signified to him a growing belief in the workplace that his colleagues and his supervisors didn't think he could do the job. And so what he testified ultimately is he just responded by tripling down on his demonstration that he could work. Showing up, doing the job, carrying food with his left hand, talking to customers, doing all of the same things. Let's say that we accept your statements about the discrimination that was present. I guess I'm a little bit more focused on the pretext. What is the evidence of pretext here? Sure. So there are several elements to the pretext. And the first is what I would call, you could categorize it into a few buckets. The first bucket would be the overstatement of the seriousness of this Moonshine incident. So this Moonshine incident was emblematic of the sort of horseplay and, frankly, goofing around and silliness that was just very common in this workplace. And if you look at the video, the video fragment of what Bergens actually did, he didn't take anything. He reached his hand entirely into the bag of Mr. King, the guy who perpetrated the prank, who is his friend and horseplay buddy. And then he looked into an open purse of essentially a third party, a co-assistant manager, Ms. Biddle. That was it. And then the fact that the video is partially not preserved, that becomes especially relevant because what the video would have shown if the defendant had preserved it was after all this was over, Mr. King, the perpetrator of the prank, comes into the break room. They're laughing. They're joking about it. They're saying, what a funny prank. They're talking about their favorite cocktail recipes involving Moonshine. So first, you have an overstatement of the seriousness. Second, you have no investigation. You have no progressive discipline. And, of course, there's no affirmative obligation for an employer to engage in progressive discipline, but it is evidence of pretext. This court has said it again and again. And it's particularly relevant here because you have a video fragment. No one asks Bergens what happened. Nobody asked King what happened. Nobody asked anyone what happened. This was a summary termination decision. And that might be okay if we could see, well, this is an employer that frequently made these sorts of summary termination decisions. But if you look at the comparators, what really stands out is in every other case, not only was there very light, if not any, punishment, but there was coaching, talking, progressive discipline. Hey, this is a problem. We need you to do better. Nothing like that asked him about it. And he lied about it. Well, certainly the phone call itself is evidence, but let me push back because we strongly dispute that any lies took place on that phone call. What happened on that phone call, first of all, he's on the side of the road in the mountains with his family, cars blazing by on the highway. And he doesn't understand what they're even talking about at the beginning. And he's hearing accusations of stealing and that sort. And he just responds reflexively, I don't know what you're talking about. I didn't steal anything. And then it wasn't until the third question that the particulars were presented to him. And then he said, you know, the light bulb goes on and he says, okay, now I get it. I know exactly what you're talking about. And Bergen said he was relieved at that point because he thought in that moment, this is such a non-serious thing that a simple conversation would clear it up and he'd be right back on his way. Are you saying we should not consider any of that exchange because the decision to terminate had already been made? Well, I think this shows, I'm not sure I agree with the framing not consider it. What I do agree with is that the court has to credit the inference that the decision had already been made. And therefore, what occurred in that conversation isn't relevant once that inference is credited. Because although they try to walk it back in litigation, there's testimony from the decision makers that they made up their mind. This was a phone call to simply communicate a termination decision. So you've got no investigation, you've got no progressive discipline. Of course, you've got the temporal proximity, often lacking, but here very close in time to the stroke. And then you've got the comparators, right? And you've got other employees who were, again, treated far less harshly. Do you agree none of your comparators entail a breach of trust, which is what I understood Delahunt and McDonald's kind of to source the firing in? I would not go that far. I think that the comparator involving going into Mr. King's bag with the bottle caps would be a similar type of conduct that could be viewed as a similar breach of trust. But King was upset about the bottle cap incident. Yeah, and we don't think that the jury would have to credit the inference that he was upset here either, right? Our view is that's contrived. I want to go to that point because I take that like I think potentially you could view the evidence as King played a prank and maybe then overblew the import of going through the bag after the prank. But you still have, I think this is where the decision makers come into play, because you still have Biddle, who I think your client acknowledged at that position, was upset. You have King saying he was upset. You have them reporting that to Pelham, who then reports that up to McDonald and Delahunt. So was it improper on McDonald and Delahunt's part to look at the video, take the fact that employees were upset, and from there conclude this was the type of violation that would warrant a firing? The question, and I want to, I'm not trying to dodge the question I promised, I think we didn't move for summary judgment affirmatively, right? A jury could credit the inference that McDonald and Delahunt made that decision totally unencumbered by any discriminatory animus. The question here, however, isn't whether what McDonald and Delahunt did fell within the possible bounds of business judgment, and I think this is part of what tripped the same decision. Summary termination, but for the discrimination, and that's just where the defendant's case falls very short, right? I mean, what we have shown, going back to the affirmative evidence, is there's sort of two very closely related theories that could be at play here. I mean, number one is, Bergens was dead man walking, right? This promotion had effectively gone up in smoke. It wasn't going to happen. He was on his way out one way or the other. I guess I don't understand what you mean when you keep saying it was a summary termination, because we've already talked about the fact that they did, in fact, look at the video that was shown to them from the other coworker. Granted, it wasn't the whole video that was originally available, but they looked at that. They talked to the two individuals whose personal belongings were involved in this, and they talked to your client. Now, I know that you say that, well, before they ever talked to him, they'd already made up their mind, but they also knew that he was an assistant manager and someone who they were considering for a management position, though I also understand your argument that you say that they were no longer considering him for that management position, but shouldn't we be able to consider that full context to determine whether or not your argument kind of holds water here? Sure, and I'm not sure I'm totally following the question. Well, maybe I should get back to the beginning. You said that it was a summary termination. I don't believe that it was a summary termination. It sounds to me like they took some steps to investigate what was going on before the decision was made that he would be terminated. And one factual quibble on the question. King and Biddle were never interviewed, they were never spoken to. So the decision makers got the video from PIRM, and that was it, based on the video and sort of the text communication from PIRM, that was it. So Bergens was never talked to, again, before the decision. Neither was King, neither was Biddle, so I just want to correct that point. When you say they weren't talked to, they reported to PIRM that they were upset about this. They reported to PIRM, that's right, but the decision maker, and I don't want to get into a semantic fight about the definition of summary, right? You essentially, other than the one point I make in rebuttal, have the facts correct. This was a quick and decisive decision in favor of termination without doing anything that would look like a standard deliberative investigation, go back and speak to the people who were involved. That's the point. What more do you need if the theory is that there was an interference with other employees' personal property that represented a breach of an egregious exercise of judgment in the wrong way? There's no dispute, there's no genuine dispute that Biddle was upset. They knew that, McDonald and Delahunt knew that. I guess, what more investigation would you need? Why isn't that enough to substantiate the termination? Yeah, and again, I'm trying not to quarrel, but that's just not the question here, right? I mean, the question here isn't, can an employer do this if its motives are pure? Of course, an employer can do it if its motives are pure, with or without... I'm sorry to interrupt, but I see your time's up. You're pushing back on pretext, and the way you're doing that is to say they did not engage in a good faith investigation. Right. And so, we're in pretext world. So, what I'm trying to understand is, why wasn't it good faith when you had, they watched the video, they knew Biddle was upset, they called him, what more, why was that not good faith? Sure. Well, I mean, I think in a standard context, and the comparators show this, and Judge Davis, I just want to answer the question with the light on here. What a typical investigation would look like is, at a minimum, interviewing the people who were involved. That's Bergens, that's King, that's Biddle. That didn't happen. That would show some amount of deliberation, and it would undercut the core theory of pretext, which is, look at this gift we got, we're looking for an excuse to get rid of this guy anyway, because of what happened to his arm, now we've got it. And employers who are trying to make that legitimate decision have nothing to fear in that circumstance, because you're not going to have all this other evidence, affirmative discrimination, all this other evidence of pretext. I'll reserve the rest of my time. Thank you. Good morning, your honors. May it please the court, Brandon Morrow for the appellees, Diverse Concepts, Island Amenities, and Smoky Mountain Blue Moose. Just a point of clarification for the court, so Diverse Concepts is a management company that provides operational support to various restaurants, hotels. In this case, the Smoky Mountain Blue Moose restaurant is one of those restaurants, and the additional one is the Timberwood Grill, which Mr. Bergens initially worked at. Mr. Bergens' disability, discrimination, and retaliation claims failed, because despite creative attempts, he's failed to show that the company's stated reason for his termination, going through one co-worker's purse and another's backpack, was not the real reason he was fired. And as the court is well aware, all of this was captured on video. Pretext is the focus of this appeal, and pretext is Mr. Bergens' burden. He failed to produce sufficient evidence from which a jury could reasonably reject the company's legitimate non-discriminatory reason for his termination. Here, he admits that he went through his co-workers' bags, he admits that he did so without their permission, and he admits they were upset about his actions. Mr. Bergens would have this court support speculation and credit conjecture, but neither of which it can do. No reasonable jury could conclude that based on the evidence, not theories, not speculation, but the evidence in this record, that Bergens was terminated because of his disability. In employment cases, the timeline is often telling, and this case is no different. In May of 2022, Bergens was hired as the assistant manager at Timberwood Grill. A few months later, mid-August of that same year, he was tapped to be the general manager at a new restaurant. The plan was for him to stay at this restaurant until about November of that year, at which time he would transition to another Blue Moose concept and train to be a general manager for the new restaurant that was going to open in the spring. Once he was tapped to be a general manager of this new restaurant, more was expected of him. He was going to be in a position of hire in the company, he was going to be over more employees, and so it was reasonable for the company to expect more of him. Now, three days later, after he was tapped to be the general manager of this new restaurant, he unfortunately had a stroke. He was out of work for approximately two weeks. Now, this is important because one thing that we don't see in the appellant's brief, and we didn't hear from the appellant during their time here, was what happened when Mark Bergens was out on medical leave. He had not been with the company long enough to have any accrued paid time off. Yet, Mr. Bergens did not miss a paycheck. Why? Because Mr. Dellehunt, the Vice President of Operations, and the decision maker in this case, made sure that Mark Bergens did not go without pay. Can I skip ahead? You may. For the comparators, we have Cartree, we have King, and Coppinger, right? Yes, your honor. I want to kind of go through those one by one. Why isn't this like the Cartree with the bottle caps? I think, and this was something that the court pointed on or got to earlier, so Cartree's situation is different for two reasons, your honor. When we're looking at comparators, we've got to have apples to apples. Not exactly, but you generally have to have someone who is similar position, reports to the same supervisor, and then they have to engage in similar type of conduct. With Cartree, it was not the same position. He was a bar supervisor. He reported to King, who was an assistant manager and on the same level as Bergens at the time, so we have an entirely different position there. But the behavior is entirely different because there was no... Entirely seems like a stretch. Okay, fair, your honor, but there was no loss of trust. I think that's fair because what King says in his deposition testimony is he never reported this. He didn't find it to be a breach of trust because no one was ever aware other than Cartree and King that this ever happened until litigation hit. And so that's what distinguishes the Cartree event. The Daniel King situation. So there, that was Daniel King, an assistant manager, engaged in putting food... Got it. So again, not a loss of trust. Poor behavior, not a loss of trust. Different. It's not similar enough to what Bergens engaged in here. And what are we using to assess similarity, I think is my question, because it seems like you have a situation where someone commits pretty egregious misconduct, but on your view, much more serious misconduct because it's in a different bucket would not be a comparator to much less serious conduct. And if I'm looking at those two situations, I would think that would be pretty probative of pretext if someone's not fired for something that's far more serious than something like happened here. So what's the through line in terms of similarity? I think in this context, I think the through line is, as you put it, can look at the effect on the employer. So let's take the Coppinger situation, had a relationship with a subordinate. Again, not appropriate, shouldn't have happened, but there wasn't a loss of trust. That loss of trust is what really impacted the employer's decision here because as we cited in our brief, Delahunt's testimony was, okay, we knew Biddle was upset, we knew King was upset, but we also had concerns because we were going to, this Bergens was an assistant manager, he had employees that reported to him. He had engaged in this behavior that amounted to a loss of trust with his co-workers and we were getting ready to promote him to a position, general manager of a new restaurant where he was going to be over a significant number of employees and we had concerns about that. What would that do for not only what it says to our employees, but could we hire, could we recruit employees because word's going to get out about what happened. And so to your point, Judge Hermendorfer, I think that loss of trust here and how it impacts the employer overall is what's important and the through line, as you put it. A couple of things that I would like to respond to that were touched on by Mr. Hanson. Delahunt's mind was not made up at the time that he called Bergens on October 19th. Delahunt's testimony was, we had pretty much decided what we were going to do, but we wanted to talk to Mark Bergens to make sure there wasn't anything we weren't seeing. And the argument about him being on the side of the road and background noise and being confused, environment aside, right is right and wrong is wrong. Bergens' testimony was clear that he was asked whether he went through Bittlesbag and Kingsback, not whether he stole anything from them, but the question was, were you asked on that October 19th phone call whether you went through Bittlesbag and Kingsback? He was asked and his answer was no. And Delahunt's testimony was, I asked him three times and it was only when I told him we had already reviewed the video footage that he was truthful with us and told us that yes, he had. And then he had proceeded to give some explanation. This was not a summary termination as the appellant would have this believe. There were particularized facts that flowed down from Bittle and King to Perham. And if I could, I would like to just walk the court through those because I think it's important for purposes of this case to understand exactly how this decision was made. So Bittle and King reported the incident to Perham on October 19th, the day after it happened. They were both upset, Bittle more so than King. Perham reviewed the video and then she sent the video to Mr. Macdonald, the director of operations. Perham then calls Macdonald and she shared Bittle and King's concerns with him. Macdonald then spoke to Delahunt, the vice president of operations. Those two, Macdonald and Delahunt, reviewed the video footage that Perham had sent them. Then they called Perham to discuss the matter. Perham confirmed that Bergens had gone through Bittle and King's bags and shared again Bittle and King's concerns about the entire episode. So we have video evidence. We have these steps that the company went through. I think Judge Hermendorfer's point earlier, I'm not sure what else an employer would need to do to get the facts it needs to make a decision. Well, I think brother counsel would say that the company had a policy that allowed for, didn't require it, but allowed for progressive discipline and that apparently was not something that was considered or certainly it was something that was not implemented. Why didn't that happen? Well, I think your honor, it goes to that loss of trust. You have a situation where from Delahunt's point of view, if this was egregious enough in his view to terminate, but also if there was progressive discipline, if there was something short of terminating Mark Bergens, what message does that send to other employees? Not just King and Bittle, but other employees in that restaurant and the restaurant that Mr. Bergens was getting ready to take over. I think that's the issue there, your honor. What import is it to the fact that Perham did not report up that all of this arose from King's prank originally? I don't think Perham was aware that it was a prank originally. I thought King informed her. I thought she was informed at some point that King was playing a prank. So, good point, your honor. The distinction there and where Perham draws the line is it started as a prank. There's this issue where King goes to get the moonshine. I understand the factual context, but I think opposing counsel would say, well, the fact that King started this as a prank is important context for the ultimate decision making as to the seriousness of Bergens' misconduct. That's fair, your honor. I think the difference here, though, is what was not a prank and therefore why it maybe doesn't carry as much import is King never told Bergens, go look in my bag. He never gave anyone permission to do that. So, Bergens' willingness to engage in this and perhaps further what started out as a prank, that changed when he went through their bags without permission. That fact doesn't change whether it started as a prank or not because that at the point that he did that on his own volition, that's outside of the context of a prank. He was engaging in this behavior and that's where the loss of trust occurred. If we set King aside, would Biddle's testimony support on its own would have been sufficient to support the firing? I think it would, your honor. I think it would because you have an individual who, again, Biddle was not involved in the kind of lead up and you have an assistant manager who has her purse in the manager's office. Has that peered into or gone through by Mr. Bergens and she's, I think most would say, rightfully upset about that. Again, as that information flows, Perham, McDonald, Delahunt, I think that's certainly a viable and sufficient reason to terminate. And again, your honors, I think there is business judgment that comes in here. But this is not a situation where you have this kind of larger discriminatory environment. The decision maker here was the same person who made sure Mark Bergens did not miss a day's pay while he was on medical leave. And there was not an accommodation that Mr. Bergens sought when he returned that he did not receive. This was a company and these were individuals who were committed to making sure that Bergens got healthy, that he was on track for this promotion. And so this is not like the cases we have where there's some larger discriminatory environment. Those aren't the facts here. A couple of additional points quickly. So after Mr. Bergens' termination, he sends a text message to McDonald apologizing for his actions regarding the bags and admitting that he made a mistake. Then that same day, he sends an email to both Delahunt and McDonald in which he admitted he was not thinking clearly at the time he did this, that this whole situation was his fault and his actions were a stupid mistake. And so I think it's important for your honors to view this. These were Bergens' admissions in real time, not post-litigation or anything like that. These were his admissions in real time and that's how he viewed the circumstances. It was his fault. He had made a stupid mistake and he was not thinking clearly. I see my time is up, so unless the panel has any other questions, I'll retire. I want to touch three brief points if I may in rebuttal. The first, just to make sure that the points are surfaced in terms of affirmative evidence of discrimination, which again, is in this record in ways that you almost never see in employment discrimination cases. The first is really the extent to which the evidence shows that Mr. Bergens was excluded from planning for the opening of the Blue Moose Alcoa. And again, I think you look to what defendant presents as its strongest evidence, which is the text messages between Bergens and McDonald, and they are painful to read. You see Bergens asking about business cards, work shirts, hiring decisions, and McDonald repeatedly either ignoring Bergens or giving him the cold shoulder. Bergens' testimony also is where there used to be lots of discussion around the timberwood with Delahunt and McDonald. Within a few weeks of coming back, he was being excluded from those conversations. His training, of course he wasn't just an assistant manager, he was undergoing rigorous training. That all stopped. That went away. He could really tell something changed there. And then last, the staffing decisions. We have not only in real time, you can almost isolate the week when something started to change because Bergens had recommended Mandy Benton, his choice or his recommendation anyway, to be an assistant manager at the new restaurant. McDonald says, we're semi-a-go on that. That sounds good. And then for no reason that the record shows, it's left to inference, a few days later Delahunt says, now we changed our mind about that. We don't want Bergens' recommendation anymore. So again, you have this unusual evidence, and this kind of goes to point number two, of affirmative discriminatory intent that you often lack in these cases. Can I ask you a question about that? Of course. If we accept all of that evidence, couldn't we, isn't it also just maybe as likely that they decided that they didn't want him to be the manager, not that they actually had made a decision to terminate him? It is, right, and that's consistent with our theory of liability, right? But that would be discriminatory also. That would be discriminatory also. That was just sort of, that version of the universe never played out because of what happened, right? But if you think that he was essentially already a victim of a failure to receive his promotion, I mean, then this case goes back automatically, right? Because then they just, you transfer that discriminatory motive to, aha, now we have this pretext. Now we want to get rid of him. The second point is, I think the district court, if you distill the error down to one word, it would be myopia, right? And it was a failure to understand that comparators are just one way to show pretext, and pretext is one ingredient in discrimination. What ultimately matters is, could a reasonable jury find that discriminatory animus was a cause? Not even necessarily the only cause. They could have also thought, this was wrong, this was bad. But if they wouldn't have taken the ultimate, made the ultimate decision to do this very quick termination, but for what happened with the stroke in the right arm, then it goes to the jury for liability. I didn't get a chance to make my third point, so I will just conclude by saying, unless the court has any questions, I ask the court to reverse and remand this for trial. Thank you so much. Counsel, thank you for your argument. The case will be submitted.